1

2

3

4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6                                     EUREKA DIVISION

7

8    ANTONIO G.,[1]                              Case No.  23-cv-05381-RMI

9                 Plaintiff,

10          v.                                   **ORDER RESOLVING SOCIAL
                                                 SECURITY APPEAL**
11   KILOLO KIJAKAZI,                            Re: Dkt. Nos. 15, 17

12                 Defendant.

13

14          Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying his

15   application for disability benefits under Title II of the Social Security Act. *See* Admin. Rec. at 1.[2]  The

16   Appeals Council of the Social Security Administration declined to review the ALJ's decision. *Id.*  As

17   such, the ALJ's decision is a "final decision" of the Commissioner of Social Security, appropriately

18   reviewable by this court. *See* 42 U.S.C. § 405(g), 1383(c)(3).  Both parties have consented to the

19   jurisdiction of a magistrate judge (Docs. 8, 10) and both parties have filed briefs[3] (Docs. 15, 17).  For

20   the reasons stated below, Defendant's motion for summary judgment is GRANTED IN PART AND

21   DENIED IN PART, and the case is REMANDED to the ALJ for further proceedings consistent with

22   this order.

23          **I.      Background**

24

25   [1] Pursuant to the recommendation of the Committee on Court Administration and Case
26   Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

27   [2] The Administrative Record ("AR"), which is independently paginated, has been filed in NINE
     attachments to Docket Entry #14. *See* Docs. 14-1 through 14-9.

28   [3] Defendant's brief, Dkt. 17, is styled as a "cross-motion for summary judgment."

United States District Court
Northern District of California

<div style="float:left;">United States District Court<br>Northern District of California</div>

1    Plaintiff Antonio G. was born in Mexico and immigrated to the U.S. at 4 years old. AR at

2   631. Plaintiff would later describe his childhood as "pretty rough[.]" *Id.* Plaintiff's father was an

3   alcoholic who physically abused Plaintiff's mother; Plaintiff also experienced emotional abuse as

4   a child. *Id., id.* at 699. Plaintiff began working at age 6 and started drinking at age 13. *Id.* at 465,

5   781. By age 21, Plaintiff had become a problem drinker. *Id.* at 465.

6    Beginning in 2000, while on active duty in the U.S. Marines, Plaintiff experienced a series

7   of traumatic events. AR at 628. While Plaintiff was deployed to Japan, his wife was raped and

8   gave the couple's daughter up for adoption. *Id.* Plaintiff also saw the dead bodies of two fellow

9   servicemen who had died by suicide, including a close friend. *Id.* at 672, 1695.

10    During his time in the Marines, Plaintiff spent time in both outpatient and residential

11   mental health treatment. AR at 465. A few years later, Plaintiff saw a VA mental health provider

12   for depression, but was told after a couple of sessions that nothing was wrong. *Id.*

13    Plaintiff's next mental health appointment reflected in the administrative record was in

14   February 2019. AR at 475. A VA doctor noted "primarily depressive symptoms[,]" including a

15   depressed mood, sad expression, and dysphoric demeanor. *Id.* at 476. The doctor noted, however,

16   that Plaintiff's attention, concentration, cognition, and memory were intact, and that Plaintiff had

17   good judgment, insight, and impulse control. *Id.* The combination of a depressed or anxious

18   mood and affect and apparently intact cognition would repeat itself through the following years of

19   medical records.

20    At this appointment, Plaintiff told the doctor that he would drink up to a 12-pack of beer

21   per night on the weekends. *Id.* at 475. The doctor noted that Plaintiff "seems unmotivated to

22   change" his drinking habits. *Id.* at 477. Plaintiff also stated that his main stressors were "Work

23   and Relationship Issues[,] that he wanted a promotion but had never received one after 10 years,

24   and that he found his work "highly stressful." *Id.* at 465, 475. Coincidentally, Plaintiff worked

25   for the Social Security Administration. *Id.* at 465.

26    In March 2019, Plaintiff punched a car window in a drunken fit of rage and was sent to the

27   ER with a metacarpal fracture. AR at 360–61. The fracture required surgery and months of

28   occupational therapy to heal. *Id.* at 364, 411.

<div style="text-align:center;">2</div>

1      In June 2019, Plaintiff quit his job, citing his mental health, a poor rapport with his

2  supervisor, and the "overwhelming" work.  AR at 398, 465, 472.  Plaintiff would later attribute

3  this decision to a manic episode in his bipolar disorder.  *Id.* at 695.  Two days after quitting,

4  Plaintiff submitted his first application for Social Security benefits.  *Id.* at 18.  This application

5  was denied in 2020 on the grounds that Plaintiff was not disabled through the decision date.  *Id.*

6      Five days after Plaintiff applied for Social Security, the VA rated Plaintiff 70% disabled

7  based on a diagnosis of major depressive disorder.  AR at 387.  Plaintiff noted at this time that the

8  medication he was taking for bipolar disorder was working well.  *Id.* at 472.  However, Plaintiff

9  reported trouble sleeping due to work and career anxiety.  *Id.*  VA personnel noted Plaintiff as

10  "friendly, cooperative, and receptive to engagement" at that time.  *Id.* at 473.

11      Throughout the remainder of 2019, Plaintiff would often present to care providers as

12  depressed (AR at 466) or receive elevated scores on depression and anxiety scales (*id.* at 538).

13  Regardless, he was sometimes noted as pleasant and cooperative (*id.* at 462) and generally noted

14  to have good insight, good grooming and hygiene, and intact attention.  *See, e.g., id.* at 466–67.

15  Plaintiff was able to reduce his drinking immediately after quitting his job, but he had resumed

16  binge-drinking by November.  *Id.* at 465, 468, 538.  He noted stress in his relationship with his

17  girlfriend and family (442, 540).  He also felt "extremely anxious even thinking about going back

18  to work."  *Id.* at 465.  He was taking three mood-altering drugs, one of which also helped with his

19  high blood pressure.  *Id.* at 398.  He had tried half a dozen other prescriptions in the past, but all

20  were either ineffective or had intolerable side effects.  *Id.* at 466.

21      In late 2019, Plaintiff abruptly moved to Detroit from California in order to escape his

22  stressors.  AR at 534.  While there, he enrolled in intensive outpatient therapy through the VA.  *Id.*

23  He noted during intake that stress was his main drinking trigger.  *Id.* He said that his concentration

24  and energy level were "fair" although he suffered from poor sleep and nightmares.  *Id.* at 525.  His

25  cognition was determined to be "grossly intact" at that time.  *Id.*, *id.* at 527.

26      While in treatment, Plaintiff was noted as consistently attentive and a frequent active

27  participant in group sessions.  AR at 487–536.  At mental health check-ins, he was again noted "as

28  pleasant and cooperative and with depressed mood," or as "anxious and worked up" despite a

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1    decent mood and appropriate affect. *Id.* at 501, 504, 508. He explained that alcohol gave him

2    self-confidence and energy. *Id.* at 502. He also noted that he was "very uncomfortable" in social

3    situations due to feelings that people were staring at him. *Id.* at 501. Plaintiff missed some

4    sessions of outpatient treatment. *Id.* at 487, 509, 511. Ultimately, Plaintiff decided to return to

5    California on December 27, and he was taken off the inpatient treatment roster. *Id.* at 487. At a

6    VA appointment that day, Plaintiff was noted as suffering from bipolar disorder, anxiety,

7    depression, and hypertension. *Id.* at 490. No neurological "focal deficits" were noted. *Id.* at 490–

8    91.

9          In March 2020, Plaintiff began a job as an in-home service provider through the VA. AR

10    at 604. In May 2020, Plaintiff told the VA's career training division that he was still working as

11    an in-home service provider and was being given another patient. *Id.* at 598. Plaintiff also

12    expressed an interest in going to school for a real estate license. *Id.* By that time, Plaintiff's life

13    had gotten more chaotic, as he was "now the extr[e]mely busy father of twins." *Id.* at 594.

14    Doctors noted that Plaintiff was "tired and somewhat overwhelmed" but said he was "doing well

15    generally." *Id.* Plaintiff had reduced his drinking. *Id.* at 594. While he and his girlfriend had

16    made an attempt at couple's counseling, that had been put on hold due to the pandemic. *Id.* Once

17    again, Plaintiff was noted to exhibit an anxious expression and a "stressed" demeanor and mood,

18    but also demonstrated intact attention and memory and normal cognitive processing. *Id.* at 595.

19          By August 2020, Plaintiff reported more strain in his relationship. AR at 581. He told VA

20    mental health providers that he was "very tense and anxious" around his girlfriend, was nervous

21    about their finances and his girlfriend's spending, and felt there was too much traffic in his home

22    despite the pandemic. *Id.* All of this had led to Plaintiff feeling more anxious and drinking more

23    than he wanted to as a coping mechanism. Plaintiff requested to resume counseling. *Id.* He also

24    reported that he frequently missed his second dose of medication. *Id.* at 582. Once more, the

25    mental status exam detected a "stressed" mood and demeanor and anxious expression but no

26    cognitive or attention deficits. *Id.* By October 2020, Plaintiff had obtained some relief from his

27    anxiety after a change in his medications. *Id.* at 568. He had moved out to live with his parents in

28    Fresno and noted that this had reduced his stress and his drinking. *Id.* at 568–69. Other than that,

1    the findings were largely consistent with those from August.

2    In early December 2020, Plaintiff was drinking more heavily again, reported stress from

3    the relationship and the drinking problem, and had gained 20 pounds. AR at 564, 566–67.

4    Plaintiff expressed an interest in inpatient treatment. *Id.* at 564. Just over a week later, however,

5    Plaintiff had reduced his drinking substantially, had a "fine" mood, and was excited about new

6    work options such as selling insurance. *Id.* at 560–61. He had moved back in with his girlfriend

7    and requested counseling to help with relationship stressors. *Id.* at 560.

8    In February 2021, Plaintiff again called the VA to request inpatient treatment for his

9    drinking problem. AR at 559. By this point, he was drinking several beers and 1.75 liters of hard

10   liquor daily. *Id.* A risk-factor evaluation revealed that Plaintiff was having trouble falling or

11   staying asleep 9 to 15 nights per month, was depressed or anxious 16 to 30 days per month, and

12   was "[c]onsiderably" bothered by difficulties getting along with family and friends. *Id.* at 558.

13   Shortly afterward, the VA approved Plaintiff to attend an inpatient program called Vogue in Las

14   Vegas. *Id.* at 555.

15   Upon intake, Vogue staff noted that Plaintiff's "triggers are family issues and stress[.]"

16   AR at 1445. Cognitive assessments indicated intact attention and concentration, but also anxiety,

17   depression, and a flat affect. *Id.* at 812, 1411–1412, 1457. Vogue personnel noted that Plaintiff

18   was capable of performing activities of daily living, but that he suffered from past trauma and poor

19   coping skills. *Id.* at 813. Plaintiff rated his depression and anxiety as 3/10, his concentration as

20   6/10, and his shame as 7/10. *Id.* at 1385. He also reported sleeping poorly, with difficulty staying

21   asleep and intense nightmares twice a week that affected him the next day. *Id.* at 820.

22   Plaintiff also reported having suicidal ideation over the prior six months and stated that

23   these urges were growing stronger and more frequent. AR at 821. Plaintiff said that these

24   thoughts were triggered by family issues, were persistent, and occurred 2 to 5 times per week at

25   the time of the evaluation. *Id.* at 1460–61. Three months earlier, Plaintiff had tried to acquire a

26   rifle to shoot himself with. *Id.* at 821. Plaintiff also experienced the desire to get in an accident

27   while driving. *Id.*

28   During Plaintiff's time at Vogue, nursing logs recorded Plaintiff as having frequent, but

United States District Court
Northern District of California

1   not constant, anxiety and insomnia.  AR at 777–1247.  Plaintiff told Vogue staff that a 4/10 level

2   of anxiety was "normal" for him.  *Id.* at 792.  The records reflect that when Plaintiff was anxious,

3   it was generally at this level.  Nurses noted that Plaintiff's anxiety affected his ability to sleep,

4   which in turn affected his ability to focus.  *Id.* at 775, 834.  Plaintiff himself described "struggling

5   with staying focused on what he needs to focus on while in treatment."  *Id.* at 1402.

6   Treatment logs from Plaintiff's group therapy sessions at Vogue show that Plaintiff was

7   generally attentive and engaged, only missing a few sessions, and that Plaintiff frequently

8   provided feedback and support to his peers.  *Id.* at 1636 *et seq.*  However, Plaintiff slept through

9   one session (*id.* at 1642), declined to participate in another (*id.* at 1662), missed more for

10   undisclosed reasons (*id.* at 1671–72, 1734, 1739, 1744, 1763, 1783, 1787, 1797, 1800, 1816), left

11   a session in frustration briefly after a disagreement (*id.* at 1759), and became visibly distracted

12   during a session to the point of needing to physically jar himself to regain focus (*id.* at 1655).  He

13   often reported his relationship as a major stressor.  *Id.* at 1402.  Frequently, across evaluations and

14   evaluators, Plaintiff was reported as having a depressed mood and affect with "intact" attention

15   and memory.  *See, e.g., id.* at 1402.

16   In one group therapy session, when discussing his bipolar disorder, Plaintiff "expressed

17   how when he's on a job, it usually end[s] at the five year mark."  AR at 1789.  Plaintiff believed

18   "that this is cyclic in his life and he wants to change that moving forward in his recovery."  *Id.*

19   On April 7, 2021, Plaintiff filed the Social Security claim at issue, claiming an onset date

20   of March 15, 2021.  AR at 21, 84.  On April 30, 2021, Plaintiff was discharged from Vogue.  *Id.* at

21   336.  When completing his exit survey, Plaintiff stated that the most helpful aspect of the program

22   was "[n]ot having to worry about the small things.  I just had to work on myself and the only thing

23   we had to worry about was laundry so it helped a lot."  *Id.* at 869.  At discharge, Plaintiff's

24   depression and anxiety were rated 2/10 and his concentration 8/10.  *Id.* at 1378–79.  Overall, it

25   was believed that Plaintiff greatly benefitted from the treatment.  *Id.* at 1372–73.

26   In late May of 2021, Plaintiff completed a function report for his new Social Security

27   claim.  He reported "couch surf[ing]" and living with the mother of his children.  AR at 276.  He

28   said that he got very little sleep, had a hard time getting up, and felt groggy if he took sleeping

United States District Court
Northern District of California

United States District Court
Northern District of California

1    pills. *Id.* He reported fears that something bad would happen to him if he left the house, stating

2    that he generally stayed home if he did not have an appointment. *Id.* at 276–77. He said that his

3    anxiety went up when he was "around a lot of people[,]" so he shopped for groceries online. *Id.* at

4    277, 279. He stated that he needed phone alarms and reminders from others to take medicine and

5    had to be reminded about appointments. *Id.* at 278, 280. He claimed that changes in his routine

6    made him depressed and that he responded to stress with anxiety. *Id.* at 278.

7          Two weeks later, Plaintiff told the VA's career services division that he was "doing

8    fine[;]" the caller perceived him as "alert and friendly[.]" AR at 707. Later, Plaintiff spoke to a

9    VA mental health provider and requested individual counseling. *Id.* at 703. Plaintiff stated that

10   "[r]egardless of whether I get disability or not, I want to stay home with the [twin] girls." *Id.*

11         Also in mid-June 2021, a state disability evaluation found that Plaintiff had no limitations

12   in understanding, remembering, or applying information; moderate limitations in interacting with

13   others; moderate limitations in concentrating, persisting, and maintaining pace; and mild

14   limitations in adapting and managing himself. AR at 90. Meanwhile, Plaintiff was evaluated to

15   have moderately severe depression and severe anxiety, and he screened positive for PTSD. *Id.* at

16   696. The evaluator noted a "[p]olite, cooperative" demeanor and memory that "appeared grossly

17   intact[,]" although Plaintiff's mood and affect were observed as "Depressed and Anxious." *Id.* at

18   700–01.

19         Later that month, Plaintiff told the VA's career services department that "he wants [to] stay

20   focus[ed] on his recovery and not able to pursue any job leads at this time." AR at 671. Plaintiff

21   also began attending a support group and a group treatment program. *Id.* at 668. However,

22   shortly afterwards, Plaintiff dropped out of the support group after missing several sessions,

23   stating that he wanted to focus on individual mental health treatment. *Id.* at 646, 648, 659.

24         In July of 2021, Plaintiff endorsed moderate symptoms of depression and anxiety during a

25   psychotherapy session. AR at 656, 661. He stated that he was sleeping only 5 hours per night and

26   took an hour-long nap during the day. *Id.* He noted at one point that his mood had "been going

27   good" and that his symptoms were better overall, but that his lack of sleep, anger, and anxiety

28   about the twins triggered thoughts about drinking. *Id.* At another session, he reported a

United States District Court
Northern District of California

1    depressive episode earlier in the week. *Id.* at 659. In August 2021, Plaintiff reported that his

2    anxiety and depression were high, rating them 8/10. *Id.* at 652. Later that month, when the VA

3    contacted Plaintiff about a potential job, Plaintiff said that he was doing poorly and needed mental

4    health services. *Id.* at 650. Plaintiff stated that he was not interested in going back to work and

5    wanted to focus on his mental health and recovery. *Id.* The caller assessed Plaintiff as

6    "stressed[.]" *Id.*

7         In late September 2021, Plaintiff was given a mental health assessment. The assessment

8    noted that Plaintiff had moderately severe depression and significant anxiety. AR at 628–29.

9    Plaintiff stated that his symptoms made it "very difficult" to work, take care of things at home, or

10   get along with other people. *Id.* at 629. Plaintiff's alcohol use disorder was noted to be in

11   remission. *Id.* at 628. Plaintiff described stress from caring for his (then-17-month-old) twins,

12   difficulty controlling his emotions, and problems sleeping, stating that he slept about 4 hours per

13   night. *Id.* Once again, a mental status exam showed Plaintiff with a depressed mood, but alert,

14   oriented, not reporting or evidencing a memory impairment, and able to maintain attention. *Id.* at

15   633.

16        In 2022, Plaintiff left his girlfriend and moved in with a friend, then sought housing

17   through the VA. AR at 2219-2220, 2222. Again, Plaintiff's therapy notes reflected anxiety and

18   depression, but seemingly intact cognition and memory. *Id.* at 2208, 2214, 2217.

19        Plaintiff's treating psychiatrist at the VA, Dr. Vedantham, completed a psychiatric

20   impairment questionnaire on Plaintiff's behalf in February of 2022. Dr. Vedantham endorsed

21   symptoms of depressed mood, persistent or generalized anxiety, blunt affect, feelings of guilt or

22   worthlessness, difficulty thinking or concentrating, anhedonia, weight change, decreased energy,

23   and social withdrawal or isolation. AR at 742. Per Dr. Vedantham, Plaintiff's most significant

24   symptoms "include depressed mood and lack of motivation and energy. Plaintiff has difficulty

25   with task completion, misses appointments, sometimes is late paying bills, has poor credit. Patient

26   has marked difficulty in motivating himself to participate in any type of organized activity." *Id.* at

27   743. Dr. Vedantham noted that Plaintiff's mental status exams "consistently reveal[] markedly

28   depressed mood and flat affect and lack of motivation" which had not improved despite Plaintiff

8

1    being sober for a year. *Id.* Dr. Vedantham noted that Plaintiff "felt unable to make work

2    requirements and expectations and work made his symptoms worse." He also noted that Plaintiff

3    had good days and bad days. *Id.*

4        Dr. Vedantham opined that Plaintiff had "moderate to marked" limitations in maintaining

5    attention or concentration for extended periods and completing a workday without symptom

6    interruptions. AR at 744. Dr. Vedantham found that Plaintiff had "marked" limitations in sticking

7    to a schedule or being punctual, performing at a consistent pace without rest periods, interacting

8    appropriately with the public, asking simple questions or requesting assistance, and setting

9    realistic goals. *Id.*

10       Shortly after this evaluation, Plaintiff reported a panic attack at the thought of his ex-

11   girlfriend coming home, which he said was followed by a depressive slump. AR at 2204.

12   Through March 2022, Plaintiff continued to report an "anxious and often depressed mood[.]" *Id.*

13   at 2201, 2203. Around this time, Plaintiff's counselor's reports began to reflect that Plaintiff was

14   "doing well, motivated to treatment, engaged in personal growth" and looking for strategies to

15   coparent and reconnect with his family. *Id.* at 2168, 2185, 2187, 2200. Dr. Vedantham had a

16   slightly less rosy outlook around the same time: "Patient seems to be at his usual baseline which is

17   mildly depressed . . . . [h]e is experiencing acute relationship stressors and is transitioning to living

18   independently." *Id.* at 2191.

19       By April 2022, Plaintiff had found housing. AR at 2200. He reported doing well and

20   feeling "good," but also reported anxiety and depression. *Id.* at 2187–88, 2198. Plaintiff received

21   several leads on employment, including the Social Security Administration offering him his old

22   job back. *Id.* at 2197, 2198. While Plaintiff said he was "interested in vocational development[,]"

23   he decided not to make any decision about employment until his Social Security case was

24   resolved. *Id.* at 2185, 2197.

25       In May 2022, Plaintiff was assessed by Dr. Celina Marciano. After a review of Plaintiff's

26   symptoms and history, Dr. Marciano concluded that Plaintiff's "psychological symptoms cause

27   him to experience marked restriction of daily life activities along with marked difficulties in

28   maintaining focus and concentration." AR at 2141. She further opined that Plaintiff "presents

United States District Court
Northern District of California

1    severe cognitive impairment and lacks the capacity to sustain any form of employment.  His

2    chronic history of mental health illness has only deteriorated throughout time and will not be

3    restored." *Id.*  Dr. Marciano endorsed symptoms of depressed mood, persistent anxiety, abnormal

4    affect, feelings of worthlessness, irritability, mood swings, suicidal ideation, difficulty thinking or

5    concentrating, easy distractibility, intrusive memories of trauma, persistent irrational fears,

6    anhedonia, weight change, change in personality, decreased energy, social withdrawal or isolation,

7    and insomnia.  *Id.* at 2144.  She stated that Plaintiff had episodes of decompensation or

8    deterioration at work which exacerbated his symptoms, but elaborated only that Plaintiff "cannot

9    work or function due to the severity of his psychological symptoms[.]" *Id.* at 2145.

10           Dr. Marciano assessed Plaintiff with many moderate-to-marked and marked impairments.

11   AR at 2146.  She opined that Plaintiff was likely to miss work more than three times a month due

12   to his impairments.  *Id.* at 2147.

13           In May and June 2022, Plaintiff's VA treatment notes reflect the topic of Plaintiff's

14   custody issues with his ex-girlfriend.  AR at 2166, 2168, 2170.  He continued to report being

15   anxious and often depressed.  *Id.* at 2167, 2169.  He also reported his heart racing at night.  *Id.* at

16   2168.  However, the notes indicate that he was handling stress with coping skills.  *Id.*, *id.* at 2166.

17           Plaintiff's Social Security hearing was held on June 16, 2022.  At the hearing, Plaintiff

18   reported that his anxiety was high and that his medication had not worked well since he left

19   Vogue.  AR at 50.  Plaintiff said that his anxiety was worst in the evenings, when it "feels like a

20   panic attack." *Id.* at 51.  Plaintiff said he became anxious in "large places" with "a lotta people."

21   *Id.* at 54.  Plaintiff said that his bipolar disorder cycled between highs and lows roughly twice per

22   week.  *Id.* at 52.  During lows, Plaintiff could generally take care of himself, but did not shower or

23   do chores.  *Id.* at 53–54.  Plaintiff also said he took daytime naps during lows.  *Id.* at 56.  Plaintiff

24   noted that he suffered these symptoms despite his medications, which did not always work

25   consistently.  *Id.* at 57.  Plaintiff said that his typical day involved sleeping throughout the day,

26   trying to read, and watching TV.  *Id.* at 58.  However, Plaintiff said that he had difficulty getting

27   through books because he would lose interest in them, and that he was easily overwhelmed by TV

28   options and would lose interest in TV shows.  *Id.* at 55–56.  Plaintiff stated that he had not cared

United States District Court
Northern District of California

10

1    for his daughters since leaving rehab because they were not allowed in his transitional housing.

2    *Id.* at 59.  However, other records indicate that Plaintiff told a VA social worker that his daughters

3    lived with him three to four days per week.  *Id.* at 2170.

4    **II.    The ALJ's Decision**

5    The ALJ engaged in the required five-step sequential evaluation process.  AR at 21–34.  At

6    Step One, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since

7    the alleged onset date of March 15, 2021.  *Id.* at 21.  At Step Two, the ALJ determined that

8    Plaintiff had severe impairments of bipolar disorder, major depressive disorder, generalized

9    anxiety disorder, and post-traumatic stress disorder.  *Id.*  The ALJ found non-severe impairments

10    of alcohol abuse in remission, obesity, and hypertension.  *Id.* at 22.  At Step Three, the ALJ found

11    that Plaintiff's impairments did not meet or exceed any listed impairment because Plaintiff had no

12    limitation in understanding, remembering or applying information, no limitation in adapting or

13    managing himself, and only moderate limitations in interacting with others and concentrating,

14    persisting, or maintaining pace.  *Id.* at 23–24.  The ALJ then determined that Plaintiff retained the

15    residual functional capacity to do "simple, routine tasks and no production pace work; the

16    claimant can carry out detailed instructions; occasional interactions with a supervisor, co-workers,

17    and the public; and occasional changes to a routine work setting."  *Id.* at 25.

18    In conducting the Step Four analysis, the ALJ did not find Dr. Vedantham's opinion

19    persuasive.  The ALJ stated that Dr. Vedantham's treatment notes indicated normal findings apart

20    from depression and anxiety.  *Id.* at 29.  The ALJ also noted that Plaintiff's recent therapy sessions

21    had focused mainly on Plaintiff's sobriety and custody issues and that notes indicated Plaintiff was

22    doing "well."  *Id.*  Finally, the ALJ found that Plaintiff's "conservative" course of treatment

23    weighed against Dr. Vedantham's findings.  *Id.*

24    Similarly, the ALJ did not find Dr. Marciano's opinion persuasive.  The ALJ noted that Dr.

25    Marciano's opinion was not supported by any treatment notes from Dr. Marciano.  AR at 29.

26    Further, the ALJ noted that Dr. Marciano did not perform any mental status exams or cognitive

27    tests.  *Id.*  Finally, the ALJ stated that Dr. Marciano's opinion was not consistent with other

28    providers' mental status exams or with Plaintiff's "conservative" course of treatment.  *Id.*

United States District Court
Northern District of California

1           The ALJ found that while Plaintiff's impairments could be reasonably expected to cause

2    his symptoms, Plaintiff's symptom allegations were not entirely consistent with the medical

3    evidence "for the reasons explained in this decision."  AR at 30.

4           At Step Five, the ALJ determined that Plaintiff could work as an electronics worker,

5    garment sorter, or floor waxer.  AR at 33.  The ALJ therefore concluded that Plaintiff was not

6    disabled.  *Id.* at 34.

7    **III.    Standard**

8           The Social Security Act limits judicial review of the Commissioner's decisions to final

9    decisions made after a hearing.  42 U.S.C. § 405(g).  The Commissioner's findings "as to any fact,

10   if supported by substantial evidence, shall be conclusive."  *Id.*  A district court has limited scope

11   of review and can only set aside a denial of benefits if it is not supported by substantial evidence

12   or if it is based on legal error.  *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th

13   Cir. 1995).  The phrase "substantial evidence" appears throughout administrative law and directs

14   courts in their review of factual findings at the agency level.  *See Biestek v. Berryhill*, 139 S. Ct.

15   1148, 1154 (2019).  Substantial evidence is defined as "such relevant evidence as a reasonable

16   mind might accept as adequate to support a conclusion."  *Id.* at 1154 (quoting *Consol. Edison Co.*

17   *v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir.

18   1997).  "In determining whether the Commissioner's findings are supported by substantial

19   evidence," a district court must review the administrative record as a whole, considering "both the

20   evidence that supports and the evidence that detracts from the Commissioner's conclusion."

21   *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).  The Commissioner's conclusion is upheld

22   where evidence is susceptible to more than one rational interpretation.  *Burch v. Barnhart*, 400

23   F.3d 676, 679 (9th Cir. 2005).  However, courts "review only the reasons provided by the ALJ in

24   the disability determination and may not affirm the ALJ on a ground upon which [s]he did not

25   rely."  *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

26   **IV.    Analysis**

27          *a.  Dr. Vedantham's Opinion*

28          The ALJ provided four bases for rejecting Dr. Vedantham's evaluation of Plaintiff.  The

United States District Court
Northern District of California

12

1   court concludes that three of these bases are flawed and the fourth is insufficient to constitute

2   substantial evidence in light of the record as a whole.

3           First, the ALJ noted that "Dr. Vedantham's mental status examination findings include

4   depressed mood and anxiety but are otherwise intact, including friendly demeanor, normal eye

5   contact, normal speech, a logical and organized thought process, appropriate thought content,

6   intact memory, normal cognition, good insight/judgment, and appropriate grooming." AR at 28–

7   29.  However, "observations of cognitive functioning during therapy sessions," including "good

8   eye contact, organized and logical thought content, and focused attention . . . do not contradict . . .

9   symptoms of depression and social anxiety." *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir.

10  2014).  This is especially true here, where Dr. Vedantham stated Plaintiff's most significant

11  systems were a depressed mood, lack of motivation, and lack of energy.  AR at 743.  The relevant

12  question is not how many of Plaintiff's mental functions are normal, but whether the abnormal

13  ones are disabling.  *See Lanh H. v. Kijakazi*, 2024 WL 4133805, at *8 (N.D. Cal. Sept. 9, 2024).

14  Accordingly, substantial evidence does not support a contradiction between Dr. Vedantham's

15  report and his mental status examinations of Plaintiff.

16          Second, the ALJ noted that "Dr. Vedantham's recent therapy notes primarily discuss

17  staying sober and ongoing conflict with the mother or the claimant's children."  AR at 29.

18  However, Dr. Vedantham's report lists "relationship stressors", "parenting stressors", and

19  "addressing challenges of sobriety" as "psychosocial factors" bearing on Plaintiff's conditions.  *Id.*

20  at 741.  The fact that Dr. Vedantham would focus on the areas of Plaintiff's life that most affect

21  Plaintiff's mental illnesses while treating Plaintiff for those mental illnesses hardly contradicts Dr.

22  Vedantham's conclusions.

23          The ALJ also discounted Dr. Vedantham's opinion based on "the conservative nature of

24  the claimant's treatment."  AR at 29.  The ALJ noted that apart from Plaintiff's stay at Vogue,

25  "[t]reatment has otherwise been limited to participation in psychotherapy and the receipt of mental

26  health medications. The claimant has not required inpatient psychiatric treatment outside of the

27  residential treatment program for alcohol abuse."  *Id.* (internal citations omitted).  However, as this

28  court has stated in a previous case, psychotherapy and medications "are customary and generally

United States District Court
Northern District of California

13

1    accepted treatments for anxiety and depression regardless of severity, not 'conservative'

2    treatments reserved only for mild cases[.]" *Lanh H.*, 2024 WL 4133805, at \*9.  Several other

3    district courts in this Circuit have held that the combination of outpatient psychotherapy and

4    mental health medication is not conservative treatment.  *Torquato v. Berryhill*, 2018 WL 3064568,

5    at \*6 (S.D. Cal. June 20, 2018) (collecting cases).  And even setting aside the issue of

6    psychotherapy, many courts in the Ninth Circuit have held that a regimen of multiple mood-

7    altering drugs, such as the one Plaintiff is on, does not constitute conservative treatment.  *Joseph*

8    *S. v. O'Malley*, 2024 WL 418632, at \*13 (S.D. Cal. Feb. 5, 2024) (collecting cases).  The ALJ

9    therefore erred in discounting Dr. Vedantham's opinion on the ground that Plaintiff's treatment

10   was conservative.

11          Aside from the above rationales, the only basis that the ALJ offered for discrediting Dr.

12   Vedantham's opinion was that Dr. Vedantham's notes "indicate[d] the claimant is doing well, is

13   motivated in treatment, and is engaged in personal growth."  AR at 29.  The broad "doing well"

14   statement alone, however, do not constitute "substantial evidence in light of the record as a whole"

15   that Dr. Vedantham's conclusions were faulty.  Further, "[r]eports of 'improvement' in the context

16   of mental health issues must be interpreted with an understanding of the patient's overall well-

17   being and the nature of her symptoms."  *Garrison,* 759 F.3d at 1017.  While evidence that Plaintiff

18   is "motivated in treatment" might contradict Dr. Vedantham's finding of a generalized lack of

19   motivation, this seems like a slim ground on which to discard all of Dr. Vedantham's conclusions,

20   especially as bipolar disorder is characterized by "extreme mood swings."  *Bipolar Disorder*,

21   MAYO CLINIC (Aug. 14, 2024), https://www.mayoclinic.org/diseases-conditions/bipolar-

22   disorder/symptoms-causes/syc-20355955.

23          For these reasons, the court concludes that the ALJ erred in evaluating Dr. Vedantham's

24   report.

25              *b.  Dr. Marciano's Opinion*

26          The ALJ disregarded Dr. Marciano's opinion on several of the same bases as she

27   disregarded Dr. Vedantham's opinion, as well as on several bases unique to Dr. Marciano.  The

28   Court concludes that none of these bases were proper ones.

United States District Court
Northern District of California

14

1      The ALJ began her analysis by noting that Dr. Marciano's "opinion is not supported by

2   treatment notes from this physician." AR at 29. This omission, however, is not unusual

3   considering that Dr. Marciano had only treated Plaintiff once before issuing her report. *Id.* at

4   2143. In fact, it does not appear from the record that Dr. Marciano saw Plaintiff more than once.

5   Ultimately, Dr. Marciano seems to have been more of an examining physician than a treating

6   physician, so her lack of one treating-physician-specific form of corroboration is not substantial

7   evidence showing that her opinion is unsupported.

8      The ALJ also faulted Dr. Marciano for not performing cognitive testing or a mental status

9   exam. *Id.* at 29. However, as the Ninth Circuit has pointed out, "[p]sychiatric evaluations may

10   appear subjective, especially compared to evaluation in other medical fields. Diagnoses will

11   always depend in part on the patient's self-report, as well as on the clinician's observations of the

12   patient. But such is the nature of psychiatry." *Buck v. Berryhill,* 869 F.3d 1040, 1049 (9th Cir.

13   2017). "Thus, the rule allowing an ALJ to reject opinions based on self-reports does not apply in

14   the same manner to opinions regarding mental illness." *Id.* It is true that an ALJ may properly

15   reject a medical opinion based entirely on the self-report of a plaintiff the ALJ has properly found

16   not credible. *Ferguson*, 95 F.4th at 1202. However, as discussed in more detail below, the ALJ

17   has failed to provide the necessary "specific, clear, and convincing reason" for discounting any

18   part of Plaintiff's testimony. Therefore, the fact that Dr. Marciano's opinion did not incorporate

19   any "objective" test results is not a sufficient ground on which to reject it.

20      Substantively, the ALJ found that Dr. Marciano's "opinion is not consistent with the

21   mental status examination findings of other providers or with the claimant's conservative

22   treatment, discussed herein." R. at 30. For the same reasons that these rationales were inadequate

23   to discredit Dr. Vedantham's opinion, they are inadequate here.

24      Accordingly, the ALJ has not supplied substantial evidence to justify the rejection of Dr.

25   Marciano's opinion.

26          *c.  Plaintiff's Subjective Testimony*

27      The ALJ found that while Plaintiff's impairments could reasonably be expected to produce

28   the subjective symptoms Plaintiff alleged, Plaintiff's allegations about the intensity, persistence,

United States District Court
Northern District of California

1    and impact of these symptoms were "not entirely consistent with the medical evidence and other

2    evidence for the reasons explained in this decision." AR at 30. The ALJ credited Plaintiff's

3    allegations "only to the extent they can reasonably be accepted as consistent with the objective

4    medical and other evidence." *Id.*

5             As the Ninth Circuit has stated:

6                     To discredit a claimant's symptom testimony when the claimant has
                      provided objective medical evidence of the impairments which might
7                     reasonably produce the symptoms or pain alleged and there is no
                      evidence of malingering, the ALJ must give specific, clear, and
8                     convincing reasons for rejecting the testimony by identifying which
                      testimony [the ALJ] found not credible and explaining which
9                     evidence contradicted that testimony.

10   *Laborin v. Berryhill*, 867 F.3d 1151, 1155 (9th Cir. 2017) (internal quotations omitted). In short,

11   "the 'clear and convincing' standard requires an ALJ to show [their] work[.]" *Smartt v. Kijakazi*,

12   53 F.4th 489, 499 (9th Cir. 2022). "If the ALJ fails to provide specific, clear, and convincing

13   reasons for discounting the claimant's subjective symptom testimony, then the ALJ's

14   determination is not supported by substantial evidence." *Ferguson v. O'Malley*, 95 F.4th 1194,

15   1199 (9th Cir. 2024).

16           Here, however, the ALJ provided no such reasons. While the ALJ did note that "the

17   claimant's allegations concerning the intensity, persistence and limiting effects of these symptoms

18   are not entirely consistent with the medical evidence and other evidence explained in this

19   decision[,]" AR at 30, this broad statement falls short of the *Laborin* requirements. The Ninth

20   Circuit requires ALJs to specify "which of [a plaintiff's] many symptoms were, in the ALJ's view,

21   inconsistent with the record evidence." *Ferguson*, 95 F.4th at 1200. Here, the ALJ recited some

22   record evidence which might tend to discredit some of Plaintiff's alleged symptoms, but made no

23   effort to link specific evidence to specific symptoms as part of this analysis.[4] This was error.

24   *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015) (error where ALJ "simply stated her

25

---

26   [4] While the ALJ appears to have done some credibility analysis in the listing-related portion of her
     opinion (R. at 23–24), this is not a symptom-by-symptom analysis, but rather bears only on the
27   four broad categories of functional capacity. Further, the term "analysis" is perhaps a generous
     one; the ALJ listed Plaintiff's claims and then recounted some of the record evidence, but failed to
28   link the evidence to her ultimate conclusions or explain how the evidence necessarily contradicted
     Plaintiff's claims. This falls short of an ALJ's duty to "show [their] work" under *Smartt*.

16

*United States District Court*
*Northern District of California*

1    non-credibility conclusion and then summarized the medical evidence supporting her RFC

2    determination.").

3           For these reasons, the ALJ's assessment of Plaintiff's credibility was inadequate.

4    **V.      Instructions on Remand**

5           Plaintiff requests remand solely for an award of benefits under the Ninth Circuit's "credit-

6    as-true" rule.  The credit-as-true rule "permits, but does not require, a direct award of benefits on

7    review but only where the [ALJ] has not provided sufficient reasoning for rejecting testimony and

8    there are no outstanding issues on which further proceedings in the administrative court would be

9    useful."  *Leon v. Berryhill*, 880 F.3d 1041, 1044 (9th Cir. 2017).  Application of the credit-as-true

10   rule is inappropriate where "an evaluation of the record as a whole creates serious doubt that a

11   claimant is, in fact, disabled."  *Garretson*, 759 F.3d at 1021.

12          Here, while Plaintiff clearly suffered serious symptoms from his mental illnesses in the

13   past, it appears that Plaintiff has made great strides in managing his symptoms since becoming

14   sober.  While the record does not demonstrate a complete remission of Plaintiff's conditions, they

15   may no longer be severe enough to qualify as disabling.  *See Hoopai v. Astrue*, 499 F.3d 1071,

16   1077 (9th Cir. 2007) ("We have not previously held mild or moderate depression to be a

17   sufficiently severe non-exertional limitation that significantly limits a claimant's ability to do work

18   beyond the exertional limitation.");  *Noa*, 2018 WL 1696819, at *3 ("Thus, the fact several of

19   Plaintiff's treating physicians noted in her records that she suffered from depression does not in

20   and of itself establish Plaintiff experienced depression that was sufficiently severe to interfere with

21   her ability to work.").  Plaintiff's Vogue treatment file also contains scattered references to

22   Plaintiff being self-employed, or working as an insurance agent, immediately before or after his

23   stay.  AR at 1373, 1498, 1764.  A remand would be beneficial to clarify the fact and extent of any

24   such employment.  Accordingly, this court will remand for new proceedings consistent with this

25   opinion.

26          On remand, besides correcting the errors mentioned above, the ALJ should correct defects

27   in other parts of the opinion.  First, based on the court's review of the record, it appears that

28   Plaintiff's insomnia was not factored into the ALJ's listing analysis or RFC determination.  On

United States District Court
Northern District of California

17

1   remand, the ALJ should determine what impact, if any, Plaintiff's insomnia symptoms have on

2   Plaintiff's listing status and RFC.  To the extent that the ALJ believes Plaintiff is not credible as to

3   his insomnia symptoms, this should be made explicit as part of the credibility analysis.  *M.M. v.*

4   *O'Malley*, --- F.Supp.3d ----, 2024 WL 1981793, at \*5 (N.D. Cal. May 6, 2024).

5          Additionally, the ALJ should reconsider her evaluation of Plaintiff's limitations in

6   adapting and managing himself.  This analysis references Plaintiff's "conservative treatment"

7   despite the "conservativeness" of Plaintiff's treatment being highly questionable at best.  Other

8   cited bases for the ALJ's conclusion, such as Plaintiff's friendly demeanor and intact memory,

9   would seem to have little bearing on Plaintiff's ability to adapt or manage himself.  Further, the

10  analysis seems to disregard Plaintiff's history of quitting jobs due to stress and his reports of

11  neglecting chores and personal care when depressed.

12         Finally, the court would suggest (though it does not order) that the ALJ may want to

13  develop the record with one or more long-form cognitive examinations of Plaintiff.

14         **IT IS SO ORDERED.**

15  Dated: January 27, 2025

16

17  _____

18  ROBERT M. ILLMAN
    United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

18